## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGEL LUIS THOMAS, | No. 3:16-CV-00451 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| ANGELA R. DUVALL, *et al.*, | |
| Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### APRIL 7, 2022

## I.    BACKGROUND

This matter commenced in 2016 when Angel Luis Thomas, formerly a Pennsylvania state prisoner confined at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon"), filed a civil rights complaint—which he later amended—alleging that numerous prison officials violated his Constitutional rights.[1] Thomas raised several issues including claims that Defendants: interfered with his right of access to courts; interfered with his rights of free speech, association, and privacy; conspired to deprive Thomas of those constitutional rights; and conspired to interfere with Thomas' ability to testify in federal court.[2]

---

[1]    Doc. 21.

[2]    *Id.*

In October 2019, Magistrate Judge Susan E. Schwab issued a Report and Recommendation recommending that this Court grant in part and deny in part Defendants' motion for summary judgment.[3] First, Magistrate Judge Schwab recommended finding that Defendants had admitted certain factual allegations in Thomas' amended complaint by failing to properly deny those allegations, as required by Federal Rule of Civil Procedure 8(b)(6).[4]

With regard to Thomas' access to courts claim, Magistrate Judge Schwab determined that this claim should survive summary judgment, as several admitted allegations supported Thomas' claim.[5] As to Thomas' freedom of speech and association claims, Magistrate Judge Schwab recommended that summary judgment be denied on the basis that Defendants failed to demonstrate, at the summary judgment stage, a rational connection between their actions and any legitimate penological interest.[6] Magistrate Judge Schwab recommended that summary judgment be granted as to Thomas' equal protection and conditions of confinement claims due to his failure to exhaust administrative remedies, and be denied as to Thomas' 42 U.S.C. §§ 1985(2) and 1986 conspiracy claims because Defendants

---

[3]   Doc. 87.
[4]   *Id.* at 16-21.
[5]   *Id.* at 38-43.
[6]   *Id.* at 44-47.

failed to proffer any argument in favor of summary judgment as to those counts.[7]

Over Defendants' objections, this Court adopted the Report and Recommendation.[8]

After disposing of Defendants' motion for summary judgment, six claims remained in this matter, including Thomas' claims for: (1) a violation of his right of access to courts (Count Two); (2) conspiracy to violate his right of access to courts (Count Three); (3) a violation of his rights to privacy, freedom of speech, and freedom of association (Count Four); (4) conspiracy to violate his rights to privacy, freedom of speech, and freedom of association (Count Five); (5) conspiracy to deter him from testifying in federal court (Count Seven); and (6) the failure of certain Defendants to prevent others from deterring Thomas from testifying in federal court (Count Eight).

Those remaining claims are largely premised on a series of discrete acts that occurred in 2014 and 2015. Specifically, Defendants' allegedly "wrongfully depriv[ed] Plaintiff of confidential contact visits with his attorney on August 14, 2014, October 30, 2014, May 23, 2015, and at other times in 2014 and 2015" and "refused to accommodate any confidential contact attorney visit for Plaintiff."[9]

The Court held a bench trial in this matter on December 13, 2021. Following the conclusion of Thomas' case-in-chief, both Thomas and Defendants moved for the entry of judgment on partial findings, pursuant to Federal Rule of Civil Procedure

---

[7] *Id.* at 26-33, 51.
[8] Doc. 94.
[9] Doc. 21 ¶¶ 166, 170, 174, 178, 187, 190.

52(c).[10] This Court denied Thomas' motion, but granted Defendants' motion and entered judgment in favor of Defendants as to all counts alleging the existence of a conspiracy after concluding that Thomas had failed to demonstrate the existence of any conspiracy.[11] Accordingly, judgment was entered as to Count Three, Count Five, Count Seven, and Count Eight,[12] leaving only Counts Two and Four remaining.

Set forth below are this Court's findings of fact and conclusions of law following the bench trial. In accordance with the following reasoning, this Court concludes that Thomas has failed to establish that Defendants violated either his right of access to courts or his rights of privacy, freedom of speech, or freedom of association. Consequently, the Court will enter judgment in favor of Defendants.

---

[10] Doc. 193 at 144-48.

[11] *Id.*

[12] Although Count Eight does not directly allege a conspiracy between Wendle, Green, and Eckard, because Count Seven, alleging a violation of § 1985, fails, so too does Thomas' § 1986 claim. *See Gary v. Pa. Hum. Rels. Comm'n*, 497 F. App'x 223, 227 (3d Cir. 2012) ("Absent a valid § 1985(3) claim, [appellant's] claim under 42 U.S.C. § 1986 fails, as liability under that statute is predicated on actual knowledge of a § 1985 violation").

## II.   FINDINGS OF FACT[13]

### A.   General Facts

1.   During 2014 and 2015, Angel Luis Thomas was an inmate confined at
     SCI Huntingdon.[14]

2.   SCI Huntingdon lacks any facilities that are designed to accommodate
     entirely confidential visits.[15] Rather, the attorney-client meeting rooms
     are designed so that prison staff may see into the rooms and hear if
     someone shouted from within the room.[16]

3.   The attorney-client meeting rooms are designed in this matter for the
     safety of the individuals in the rooms and for prison security. Prison
     staff must be able to see into the meeting rooms so that they may
     respond in the event of a physical altercation or medical emergency.[17]

---

[13]   Thomas argues that this Court cannot reach any findings of fact or conclusions of law proposed
by Defendants, as they did not set forth any prior to trial, and cites for that proposition Local
Rule 48.2. Doc. 199 at 21-2. While Local Rules 48.2 does require parties to "file requests for
findings of fact and conclusions of law with the pretrial memorandum," it does not provide for
the sanction that Thomas requests, and his request is therefore denied. Even if that Rule did
provide for such a sanction, it is well established that a court may "depart from the strictures
of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so
doing does not unfairly prejudice a party who has relied on the local rules to his detriment."
*United States v. Eleven Vehicles*, 200 F.3d 203, 215 (3d Cir. 2000). Here, taking Thomas'
proposed course of action would result in a fundamentally flawed outcome because, as
discussed below, his remaining claims are without merit. Furthermore, Thomas has not relied
on the Local Rules to his own detriment, nor was he prejudiced by Defendants' actions, as they
filed proposed findings of fact at the conclusion of trial, and Thomas could reasonably
anticipate what those proposed facts would be.

[14]   Doc. 21 ¶ 3.

[15]   *Id.* ¶ 28.

[16]   Doc. 193 at 152.

[17]   *Id.* at 152-54.

SCI Huntingdon Captain Ronald Smith testified convincingly to the dangers that are present in visiting rooms, and noted that SCI Huntingdon "had incidences where individuals have been assaulted in the visiting room"[18] and "had medical emergencies in the visiting room, where someone may have had a heart attack or may have had an adverse health reaction."[19] Prison officials must be able to see and respond to any such emergencies if they arise.

4.    SCI Huntingdon is a maximum-security facility and, because of the security risk posed by the prisoners there, SCI Huntingdon does not provide fully private contact rooms for guest visits.[20]

5.    In 2014 and 2015, Thomas was involved in two cases that resolved unfavorably for Thomas: *Thomas v. State of Pennsylvania Department of Corrections, et al.*, No. 3:13-CV-02661 in the United States District Court for the Middle District of Pennsylvania, filed on or about October 29, 2013, and *Thomas v. Hileman, et al.*, No. CP-31-CV-1376-2015 in the Court of Common Pleas for Huntingdon County, Pennsylvania, initially filed by mailing from SCI Huntingdon on December 8, 2014, and re-filed on September 30, 2015.[21]

---

[18]   *Id.* at 153.
[19]   *Id.* at 154.
[20]   *Id.* at 174.
[21]   Doc. 21 ¶ 59.

6.      In *Thomas v. Department of Corrections*, Thomas alleged, *inter alia*, that he was wrongfully given a misconduct report and sanctioned with fifteen days of cell restriction and the loss of two custody levels, and was wrongfully moved out of the honor block at SCI Huntingdon on two occasions.[22] Summary judgment was ultimately granted in favor of the defendants after the late Honorable Edwin M. Kosik determined that many of Thomas' claims were barred by the applicable statute of limitations, and Thomas had failed to exhaust his administrative remedies as to the remaining claims.[23]

7.      In *Thomas v. Hileman*, Thomas alleged retaliation by prison officials; several of the claims in that action were subsequently dismissed after the trial court sustained the defendants' preliminary objections.[24] Thomas appealed that decision, but the Superior Court of Pennsylvania dismissed the appeal because the trial court's order dismissed only some of Thomas' claims and was therefore not a final, appealable order.[25] In its order, the Superior Court noted that "[t]he record indicates that retaliation claims asserted against defendants M. Hileman and D. Ernest remain pending below."[26] Nevertheless, Thomas took no

---

[22]    *Thomas v. State of Pa. Dep't of Corrs.*, 3:13-CV-02661 (M.D. Pa. ECF No. 1).
[23]    *Id.* at ECF Nos. 50, 51.
[24]    *Thomas v. Hileman*, 2226 MDA 2015 (Pa. Super. Ct., Mar. 1, 2016 Docket Entry).
[25]    *Id.*, Apr. 28, 2016 Disposition Comment.
[26]    *Id.*

further action in that matter and "essentially abandoned the *Hileman* litigation."[27]

8.     Thomas candidly admitted during the bench trial that he did not "know if [he] could have won" those cases even with full access to an attorney.[28] Similarly, his counsel, Marianne Sawicki, Esq., stated that she was not sure if Thomas "could prevail" in either of those cases.[29]

9.     Thomas met with an attorney, Marianne Sawicki, Esq.,[30] three times while incarcerated at SCI Huntingdon: on August 14, 2014, October 30, 2014, and May 23, 2015.[31]

**B.     Events of August 14, 2014**

10.     On August 14, 2014, Thomas sought to meet with his attorney, Sawicki, "to go over his legal papers."[32]

11.     Angela Duvall and Matthew Ritchey, who were on duty in the visiting room that day, refused to allow Thomas to confer with Sawicki in a fully "confidential" contact visit; Green and Dickson upheld that decision and instructed Duvall and Matthew Ritchey to tell Thomas to confer with his attorney in the general visiting room.[33]

---

[27]  Doc. 21 ¶ 64.
[28]  Doc. 133 at 8.
[29]  *Id.* at 49-50.
[30]  Sawicki has notified the Court that she is now retired from the practice of law. Doc. 200.
[31]  Doc. 21 ¶ 133.
[32]  Doc. 21 ¶¶ 74, 75.
[33]  *Id.* ¶¶ 79-81.

8

12.    Thomas and Sawicki were eventually placed in one of SCI Huntingdon's standard non-contact rooms, and Duvall and Matthew Ritchey were ordered to carry papers back and forth between Sawicki and Thomas.[34] Duvall and Matthew Ritchey did not always immediately cooperate with the transfer of papers; rather, pursuant to orders from a superior officer at SCI Huntingdon, they transferred papers between Thomas and Sawicki only every fifteen minutes.[35] Thomas alleges that he "was unable to complete his conference with the attorney."[36]

C.    **Events of October 30, 2014**

13.    On October 30, 2014, Thomas again met with Sawicki.[37]

14.    Thomas and Sawicki were directed to occupy non-contact room number one; the phones in that room were inoperative, forcing Thomas and Sawicki to shout to communicate, meaning that other prisoners, visitors, and staff members may have been able hear Thomas and Sawicki's communications.[38]

---

[34] *Id.* ¶ 83.
[35] Doc. 193 at 219-21.
[36] Doc. 21 ¶ 84.
[37] *Id.* ¶ 106.
[38] *Id.* ¶ 109.

15.   "Under those conditions, Thomas could not cover all of the matters that he wished to discuss with [Sawicki] on October 30, 2014."[39]

**D.   Events of May 23, 2015**

16.   Thomas again met with Sawicki on May 23, 2015, to prepare his testimony in a civil case brought by a different prisoner, Roberto Camacho, Jr.[40]

17.   SCI Huntingdon had recently added additional soundproofing to non-contact room number one, and that room "was empty and available when Sawicki arrived on May 23, 2015" to meet with Thomas.[41] Nevertheless, both Duvall and SCI Huntingdon Shift Captain Daniel Wendle insisted that Sawicki and Thomas use non-contact room number two, which had open louvers in the doors.[42]

18.   Wendle testified credibly at trial that the only difference between non-contact room number one and non-contact room number two is the location of the rooms, with room one being slightly further away from the officers' desk.[43] Wendle further testified that, given the choice, he always preferred to use non-contact room number two for "security and

---

[39]  *Id.* ¶ 110.
[40]  *Id.* ¶¶ 114, 115.
[41]  *Id.* ¶¶ 116, 118.
[42]  *Id.* ¶¶ 118, 120.
[43]  Doc. 193 at 164.

safety" reasons as it was easier to see inside of the room if there were an emergency.[44]

19. Thomas and Sawicki agreed to have their meeting in non-contact room number two because they did not have a great deal of confidential material to discuss.[45] During the course of that meeting, "Duvall interrupted the conference by opening the door to the attorney side of . . . [the room] without knocking or otherwise announcing her presence."[46] Duvall also spoke to Sawicki in a manner that Sawicki considered "disrespectful and menacing" and Duvall made what Sawicki considered to be "threatening and disparaging comments while seated at the officers [sic] desk."[47]

20. Despite the open louvers on the doors, the nearest prison official, Duvall, was unable to overhear the conversation between Duvall and Sawicki, and Duvall intentionally distanced herself from the room so that she could not hear the specifics of the conversation between Duvall and Sawicki.[48]

---

[44] *Id.* at 165.
[45] *Id.*
[46] Doc. 21 ¶ 122.
[47] *Id.* ¶123.
[48] Doc. 193 at 176-77.

21.   Because Sawicki could pass documents to Thomas through only a small slot in the wall that separated them, Thomas and Sawicki had difficulty effectively reviewing documents together.[49]

**E.   Prison Officials' Concerns Regarding Sawicki**

22.   Several prison officials gave credible testimony that, during the course of Sawicki's visits with her clients, officials at SCI Huntingdon became worried about some of her behavior—in particular, her habit of hugging and kissing her clients on the cheek as a greeting and providing them with food.[50]

23.   Although Sawicki's behavior was not necessarily "concern[ing]" on its own, "it d[id] present a potential problem in that by going outside the norm or trying to create a situation that is unusual on a regular basis, it can help contribute towards complacency of the staff, so that when they start to see that behavior, they can start to accept it as more normal . . . which . . . has a tendency to lower the observation" of that individual and possibly permit the smuggling of contraband.[51]

24.   This concern is particularly heightened when it comes to a visitor providing an inmate with food because, previously at SCI Huntingdon, "inmates [would] introduce drugs and other paraphernalia through the

---

[49]   Doc. 21 ¶ 126.
[50]   Doc. 193 at 157, 178, 197-98.
[51]   *Id.* at 157-58.

visiting room in the form of balloons, where the visitor would drop it into a bag of chips or into the food item or even a cup or a beverage, and then [the prisoner] would consume it. And then [the prisoner] would return to their cell and then retrieve it after they defecated."[52]

25.   Staff at SCI Huntingdon were instructed to treat behavior such as that exhibited by Sawicki as "a [red] flag" that should "draw[] attention to the individual," as behavior was often used to facilitate the smuggling of contraband.[53]

26.   Importantly, "[t]he introduction of contraband imposes a significant threat not only to the security of the facility, [but also] to the residents that live there, and to the staff that work there."[54] The threat arises because "[t]ypically, what you see being introduced as contraband into the facilities can range anywhere from money to drugs to weapons and implements of escape."[55]

**F.    Credibility of the Witnesses**

27.   The Court finds that all witnesses were generally credible, with the exception of Sawicki.

---

[52]   *Id.* at 158-59. *See also id.* at 178, 198.
[53]   *Id.* at 159.
[54]   *Id.* at 150.
[55]   *Id.*

28.   Sawicki's testimony was largely incredible. Not only was Sawicki's demeanor evasive and untrustworthy, but her answers to questions were largely unresponsive. It appeared to the Court that Sawicki, rather than answer in a forthright manner the questions that were propounded to her, doggedly attempted to instead answer the question that she wished had been asked of her.

29.   More importantly, many of Sawicki's representations have been, at best, inconsistent. For example, in the amended complaint that Sawicki filed, she represented that, during the August 14, 2014 visit, Duvall and Matthew Ritchey "did not cooperate with the transfer of papers" between Thomas and Sawicki.[56] However, after numerous attempts to evade a direct question, Sawicki eventually admitted at trial that Duvall did in fact pass papers between Sawicki and Thomas, although Duvall did so only every fifteen minutes.[57] By further way of example, Sawicki testified at trial that she had "never kissed an inmate."[58] She later admitted, however, that she had kissed an inmate named Carlton Lane in a friendly manner as a greeting,[59] and Lane likewise confirmed that they had shared a "kiss on the cheek."[60]

---

[56]   Doc. 21 ¶ 84.
[57]   Doc. 193 at 219-21.
[58]   *Id.* at 64.
[59]   *Id.* at 78
[60]   *Id.* at 139.

30.     The sum of Sawicki's demeanor, evasive answers, and inconsistent representations to the Court indicates to this Court that she lacks credibility, and her testimony is afforded little weight.

## III.   CONCLUSIONS OF LAW

### A.     Standard of Review

#### 1.     Freedom of Speech, Association, and Privacy

Prisoners retain limited First Amendment rights in prison.[61] As to Thomas' right to freedom of speech and freedom of association, although such rights are "among the rights least compatible with incarceration," they are not necessarily "altogether terminated by incarceration" and inmates may retain such rights if they are "[]consistent with proper incarceration."[62]

As to the right to privacy, the United States Supreme Court has held that such a right "is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional

---

[61]   *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) (holding "that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system").

[62]   *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

security."[63] Similarly, a prisoner has little, if any, right to privacy when it comes to a prison "monitoring his conversations with visitors."[64]

### 2.    Access to the Courts

It is well established that "[u]nder the First and Fourteenth Amendments, prisoners retain a right of access to courts."[65] To demonstrate a denial of access to courts, a prisoner "must show (1) that [he] suffered an 'actual injury'—that [he] lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that [he] ha[s] no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit."[66] Critically, however, "this right does not entail unfettered or totally unrestricted visitation with counsel, for it must yield to legitimate penological interests."[67]

### 3.    Burden Shifting Framework Where a Prisoner's Constitutional Rights Have Been Impaired

The United States Supreme Court "held in *Turner v. Safley,* 482 U.S. 78 (1987), that a prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological interests.'"[68] This deference is necessary because "prison administrators, and not the courts, are to make the

---

[63]  *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984).
[64]  *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972).
[65]  *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).
[66]  *Id.* at 205 (quoting *Christopher v. Harbury,* 536 U.S. 403, 415 (2002)).
[67]  *Thomas v. Duvall*, No. 3:16-CV-00451, 2019 WL 8013742, at *14 (M.D. Pa. Oct. 3, 2019) (internal quotation marks omitted).
[68]  *Lewis v. Casey*, 518 U.S. 343, 361 (1996) (quoting *Turner*, 482 U.S. at 89).

difficult judgments concerning institutional operations," which permits prisons "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."[69]

Where a constitutional right has been impinged, under *Turner* courts must determine "whether a prison regulation is 'reasonably related to legitimate penological interests.'"[70] The burden rests on the defendants to demonstrate that there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."[71] "This burden, though slight, must amount to more than a conclusory assertion, [and] satisfying this burden may or may not require evidence; where the connection is obvious, common sense may suffice."[72] Consequently, "'a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational' or [if] it 'represents an exaggerated response to the asserted objectives.'"[73]

If a court determines that "a rational nexus [exists] between a regulation and a legitimate penological interest," it must then determine whether the prison's actions or rules were reasonable by considering three factors: "(1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on

---

[69]  *Id.* (brackets and ellipsis omitted).
[70]  *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006) (quoting *Turner*, 482 U.S. at 89).
[71]  *Id.* (quoting *Turner*, 482 U.S. at 89-90).
[72]  *Id.* at 360-61 (brackets and internal quotation marks omitted).
[73]  *Id.* at 360 (quoting *Turner*, 482 U.S. at 89-90 (brackets omitted)).

prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the regulation that fully accommodate the prisoners' rights at de minimis cost to valid penological interests."[74]

**B.     Application of the Law to the Facts of this Case[75]**

**1.     Access to Courts**

Thomas' claim related to the denial of his right of access to the courts fails because he has not proven the elements of such a claim. As noted in Magistrate Judge Schwab's Report and Recommendation, the facts that have been deemed admitted appear to establish that Defendants obstructed Thomas' ability to meet with his attorney.[76] However, Thomas has failed to establish that he "lost a chance to pursue a nonfrivolous or arguable underlying claim."[77] Thomas introduced no evidence whatsoever that his claims in *Thomas v. State of Pennsylvania Department of Corrections, et al.*, No. 3:13-CV-02661 or *Thomas v. Hileman, et al.*, No. CP-31-CV-1376-2015, were arguable.

---

[74]  *Id.* (brackets and internal quotation marks omitted).

[75]  As an initial matter, Darren Dickson testified credibly that he had no interactions with Thomas or Sawicki and was only involved in one of the alleged incidents at issue here. Doc. 193 at 168-70. Dickson's involvement in that incident was limited to calling a captain to address Sawicki's complaint about the meeting room provided to her and Thomas. *Id.* at 170-71. That testimony was uncontroverted and, accordingly, Thomas had failed to demonstrate that Dickson violated Thomas' rights in any manner, and judgment must be entered in Dickson's favor.

[76]  Doc. 87 at 43.

[77]  *Monroe*, 536 F.3d at 205 (internal quotation marks omitted).

To the contrary, Thomas candidly admitted in his opening statement at trial that he did not "know whether [he] could have won" his prior cases,[78] and his attorney was likewise unsure whether Thomas could have prevailed in those cases.[79] More importantly, in *Thomas v. State of Pennsylvania Department of Corrections, et al.*, summary judgment was entered in Defendants' favor after Judge Kosik determined that procedural bars precluded consideration of the merits of Thomas' case.[80] This indicates that the absence of counsel had no impact on the resolution of that case. Similarly, the Court of Common Pleas of Huntingdon County dismissed most of the claims in *Thomas v. Hileman* with prejudice, indicating little merit with respect to those claims,[81] and Thomas eventually abandoned that action,[82] indicating a lack of merit to his other claims.[83]

Second, even if Thomas could establish that his claims were arguable, the Court finds that Defendants' actions in imposing some restrictions on Thomas' ability to meet with Sawicki were reasonable. Although Thomas could not meet with his attorney under the conditions that he desired, he was able to meet in a semi-private conference room. Prison officials could see into said room and could hear if

---

[78]   Doc. 133 at 8.
[79]   *Id.* at 49-50.
[80]   *Thomas v. State of Pa. Dep't of Corrs.*, 3:13-CV-02661 (M.D. Pa. ECF Nos. 50, 51).
[81]   *Thomas v. Hileman*, 2226 MDA 2015 (Pa. Super. Ct., Apr. 28, 2016 Disposition Comment).
[82]   Doc. 21 ¶ 64.
[83]   Thomas asserts that he did not understand the Superior Court's statement that certain claims remained pending before the trial court. Doc. 21 ¶ 63(l), (m). The Court finds this assertion unconvincing, given the plain language used by the Superior Court stating that Thomas' case was still pending before the trial court.

Case 3:16-cv-00451-MWB   Document 201   Filed 04/07/22   Page 20 of 24

someone were shouting within the room, although officials could not hear the details of Thomas' conversations with his attorney. Prison officials explained that, for security purposes, they required visual access to the rooms and the ability to hear loud noises. They explained that this was required in case the participants began to fight, or if there were a medical emergency that required prison officials to respond and provide life-saving medical measures.

Protecting the lives of inmates and visitors and maintaining the security of SCI Huntingdon constitutes a legitimate penological interest.[84] Moreover, common sense confirms the testimony provided at trial; in order to protect the participants of a meeting and ensure that no contraband is passed between them, contact must be limited, and prison officials must be able to see and hear the participants inside the room. This is especially true at SCI Huntingdon, which is a maximum-security facility[85] that houses more dangerous individuals.[86] Accordingly, Defendants have met their "slight" burden of providing a reasonable explanation for imposing restrictions on the ability of Thomas, and all other inmates,[87] to meet with their attorneys.[88]

---

[84] *Jones*, 461 F.3d at 361.

[85] Doc. 193 at 174.

[86] *Cf. Lewis*, 518 U.S. at 361 (noting that courts must "accord adequate deference to the judgment of the prison authorities" in their determinations, a "principle of deference [that] has special force . . . [where] the inmates in [question] include 'the most dangerous and violent prisoners in the . . . prison system,' and other inmates presenting special disciplinary and security concerns").

[87] *See* Doc. 193 at 196-97 (testimony of former SCI Huntingdon Superintendent James Eckard that restrictions apply to all inmates and their attorneys).

[88] *Id.* at 360-61.

Turning then to the three *Turner* factors, the weight of those factors demonstrates that Defendants' actions were reasonable. As to the first factor, whether inmates retain alternative means of exercising the circumscribed right,[89] Thomas retained alternative means of meeting with his attorney. Thomas met with Sawicki in an attorney-client meeting room on each of the three occasions referenced in the complaint. Although the rooms were not entirely private—the rooms permitted prison officials to see inside and hear loud noises—the evidence does not establish that any prison officials actually overheard Thomas' conversations with Sawicki. To the contrary, Duvall testified credibly that she could not hear their conversation.[90] Thomas was also provided the option to meet with Sawicki in the general meeting area.[91] While these accommodations may not have been considered optimal by Thomas or his attorney, they did permit alternative means for Thomas to meet with his counsel.

Second, the burden on the prison in acquiescing to Thomas' requested meeting accommodations[92] would have been significant. Prison officials must be able to see inside the meeting rooms—and hear shouts or loud noises—to ensure the safety of the meeting participants and the prison in general. The costs of a death or an incident of serious illness or injury inside one of the meeting rooms—either from

---

[89] *Jones*, 461 F.3d at 360.
[90] Doc. 193 at 176-77.
[91] *Id.* at 150-51.
[92] *Jones*, 461 F.3d at 360.

a medical emergency or from an assault—would undoubtedly be significant, and not simply from a monetary perspective,[93] but also from the loss of morale and a loss in public confidence in the ability of the prison to protect prisoners and visitors. This is to say nothing of the costs and injuries that could result if prisoners used the confidential meeting rooms to transfer contraband such as weapons, escape tools, or narcotics.

Finally, Thomas has not set forth any alternatives that would permit him to meet in an entirely private setting with his attorney that would have a *de minimis* impact on the security of SCI Huntingdon,[94] and the Court is unable to imagine any such alternatives. There simply does not appear to be any way in which prisoners may safely meet with their visitors without prison officials being able to monitor—in some way—such meetings to ensure that all participants are safe and that no contraband is exchanged. Consequently, even if Thomas had suffered a constitutional injury—which he did not—the restrictions in his ability to meet with his attorney "are not of constitutional significance," and judgment must be entered in favor of Defendants.[95]

---

[93] There would likely be a civil suit against SCI Huntingdon and its officials for what would undoubtedly be considered, at a minimum, negligence in permitting maximum-security prisoners to meet in private contact rooms where prison officials could neither see nor hear the events that transpire within that room.

[94] *Jones*, 461 F.3d at 360.

[95] *Lewis*, 518 U.S. at 362.

### 2. Right to Freedom of Speech, Privacy, and Association

As to Thomas' freedom of speech, privacy, and association claim, the Court finds that Defendants' actions did not impinge upon those rights.[96] Even if the Court were to conclude that Defendants' actions impinged upon Thomas' rights, for the reasons discussed above with respect to Thomas' access to courts claim, the Court would find that Defendants' actions were reasonably related to legitimate penological interests, and therefore did not offend the constitution.[97]

## IV. CONCLUSION

In accordance with the above discussion, the Court concludes that Thomas has failed to demonstrate that Defendants violated his rights of access to courts, or to privacy, freedom of speech, or freedom of association. Moreover, even if Defendants' actions violated Thomas' rights, those actions were reasonably related to legitimate penological interests and therefore did not violate the constitution.

At bottom, it appears to the Court that this case is not about Thomas and an alleged violation of his constitutional rights. To the contrary, Thomas admitted at

---

[96] As discussed previously, the rights of association and privacy are highly circumscribed in prison, if not eliminated altogether. *Overton*, 539 U.S. at 131; *Hudson*, 468 U.S. at 527-28; *Christman*, 468 F.2d at 726. Defendants' actions did not, in any way, prevent Thomas from associating with his attorney. Moreover, any invasion of his right to privacy was minimal, and was virtually nonexistent in light of the fact that Duvall could not actually hear Thomas' conversation with Sawicki. And while "the precise contours of a prisoner's right to free speech are obscure," *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) (brackets, ellipsis, and internal quotation marks omitted), the Court cannot conclude that Defendants' actions here violated Thomas' right to free speech, as he was still able to freely communicate with his attorney.

[97] *Jones*, 461 F.3d at 360.

23

trial that he was "[n]ot bothered" by any of the incidents in the complaint.[98]

Furthermore, he "never had a confrontation" with Defendants, he did not have "a problem with" Defendants, and he did not know or recall many of the Defendants.[99]

Instead, this case appears to be about Thomas' attorney, Sawicki, and her umbrage at having been denied the exact conditions for meeting clients to which she believed she was entitled. That feeling of entitlement is not, however, sufficient to support a cause of action in federal court.  Consequently, Judgment will be entered in favor of Defendants.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[98]   Doc. 193 at 106.
[99]   *Id.* at 111; *see id.* at 111-12.